## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>*Plaintiff*<br><br><br>**v.**<br><br><br>**WILMER ALICEA-CURRAS,**<br>*Defendant.* | **CASE NO. 22-511 (FAB)** |

## <u>MOTION TO DISMISS THE SUPERSEDING INDICTMENT</u>

**TO THE HONORABLE FRANCISCO A. BESOSA**
**UNITED STATES DISTRICT JUDGE**
**FOR THE DISTRICT OF PUERTO RICO**

  **COMES NOW**, defendant Wilmer Alicea-Curras (hereon, Mr. Alicea), by and through the undersigned attorney, and pursuant to Rule 12 of the Federal Rules of Criminal Procedure[1], very respectfully alleges and prays as follows:

### I.  PROCEDURAL BACKGROUND

1- On April 20th, 2023, a superseding indictment was filed charging Mr. Alicea with one count for possession of an alleged machinegun pursuant to 18 USC §922(o). The superseding indictment specifically states that on or about October 24, 2022, in the District of Puerto Rico and within the jurisdiction of this Court, Mr. Alicea did knowingly possess machineguns, that is, one Sharp Brothers pistol, model Jack-9, bearing serial number J9-03124, and one Zev Technologies pistol, model ZEV-FL, bearing serial number ZFL09327, both of which had been, allegedly, modified to be capable of firing more than one shot, without manual reloading, by a single function of the trigger in violation of 18 USC § 922(o) and § 924(a)(2).

2- Mr. Alicea is a *bona fide* gun owner as he is authorized and possess them pursuant to a firearms license issued by the government of Puerto Rico.

---

[1] Fed. R. Crim. P. 12(b)(3)(A).

3- The firearms were seized by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") on October 24th, 2022, pursuant to a Search and Seizure Warrant. The firearms in and of itself were not used for any illegitimate purpose other that the ATF's allegation that the firearms are machineguns.

4- However, the ATF and the Government contend that the firearms in question are machineguns because they have a commercially available trigger (not homemade) called a forced reset trigger ("FRT"). In this case, the alleged machineguns had Powered by Graves, Alamo-15 (Alamo-15) brand FRT triggers. This type of trigger is available in the open legitimate firearms market. All major brands are readily available online or in retail stores.

5- The prosecution of persons possessing forced reset triggers like the ones in this case is sought on pursuant to an interpretation made by the ATF through an Open Letter published on March 22nd, 2022. The letter is not published or codified in the Code of Federal Regulations. The ATF's letter states that *some* of the forced reset triggers may convert a weapon into a machinegun, however the letter does not indicate which brands, make, or specifications in fact do.

## II.    INTRODUCTION

Since the *National Firearms Act of 1934* ("NFA"), federal law has heavily regulated machineguns. Indeed, as proposed, that law was known to many as "the Anti-Machine Gun Bill." The possession or transfer of a machinegun was eventually banned through the *Gun Control Act of 1968* ("GCA") and the *Firearms Owners' Protection Act of 1986*. Today, possession of a machinegun is a federal crime, carrying a penalty of up to ten years incarceration.

As previously stated, this case concerns an Open Letter issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives, purporting to interpret the federal prohibition on machineguns as extending to forced reset triggers like the ones owned by Mr. Alicea. To fully develop the following discussion, Mr. Alicea respectfully pleas that the Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial

notice of the documents filed in the case Rare Breed Triggers, LLC v. Garland, 3:22-cv-00085-ARS (2022).[2]

"It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand". See, Kowalski v. Gagne, 914 F.2d 299, 305-06 (1st Cir. 1990), citing E.I. Du Pont de Nemours & Co. v. Cullen, 791 F.2d 5, 7 (1st Cir. 1986). As such, an FRT [for example Rare Breed Triggers' FR-T 15 trigger] is a firearm attachment that forces mechanical reset of the trigger into the trigger forward, ready to fire position, allowing for quicker follow up shots. See, Rare Breed Triggers, *supra*, Docket No. 1, *Complaint* ¶ 9.[3]

In 2013, the ATF examined the Tac-Con 3MR trigger, which is a forced reset trigger designed for use in semiautomatic firearms and concluded that it did not convert a semi-automatic weapon into a "machinegun".[4] ATF did not reverse its position towards this device until March 22nd, 2022, when it issued the Open Letter in question stating that *som*e of the forced reset triggers may convert a weapon into machineguns, without mention as to which brands, make, or specifications. Undoubtedly, as will be further explained below, ATF lacks the authority to issue an Open Letter purporting to interpret the federal prohibition on machineguns as extending to forced reset triggers and should be barred from its attempt to short-circuit the legislative process. As the Fifth Circuit Appellate Court recently noted in Cargill v. Garland, 2023 U.S. App. LEXIS 344 (5th Cir. 2023):

> [W]e should feel deep discomfort at allowing an agency to define the very criminal rules it will enforce by implicit delegation. Such a delegation "turn[s] the normal construction of criminal statutes upside down, replacing the doctrine of lenity with a doctrine of severity." Carter v. Welles-Bowen Realty, Inc., 736 F.3d 722, 730 (6th Cir. 2013) (Sutton, J., concurring). The delegation raises serious constitutional concerns for making ATF the expositor, executor, and interpreter of criminal laws. Aposhian v. Wilkinson, 989 F.3d 890, at 900 (10th Cir. 2021) (Tymkovich, C.J., dissenting).

A plain reading of the statutory language, paired with close consideration of the mechanics of a semi-automatic firearm, reveals that FRTs were not meant to be included in the technical definition of

---

[2] Fed. R. Evid. 201. Copy of Rare Breed's complaint is attached to this motion as Exhibit A.
[3] Note that the FRT in Rare Breed Triggers, *supra*, was an FR-T 15, not an Alamo-15 like the one in this case. However, both of them being FRTs they function in a highly similar matter.
[4] Attached hereto as Exhibit B is ATF's letter to Tac-Con concluding that the 3MR trigger does not convert a semiautomatic firearm into a "machinegun." See also, Rare Breed Triggers, *supra*, Docket No. 1, *Complaint* ¶ 25.

"machinegun" set forth in the *Gun Control Act* and *National Firearms Act*. But even if this Court were to conclude otherwise, the rule of lenity would still require it to interpret the statute against imposing criminal liability. A rich legal tradition supports the "well known rule" that "penal laws are to be construed strictly". See, Cargill, 2023 U.S. App. LEXIS 344, at 5, citing United States v. Wiltberger, 18 US (5 Wheat.) 76, 94-95, 5 l. Ed. 37 (1820). As Chief Justice Marshall explained long ago, the rule "is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment"." *Id.*

The ATF's Open Letter violates these principles. As an initial matter, it purports to allow ATF— rather than Congress—to set forth the scope of criminal prohibitions. Indeed, the Government would outlaw FRTs by administrative fiat even though the very same agency had previously interpreted the ban on machineguns as not applying to similar devices like the previously mentioned Tac-Con 3MR trigger. Nor can it be said that the statutory definition unambiguously supports the Government's interpretation.

As noted above, it unambiguously does not, but even if it did, the statute is at least ambiguous in this regard. And if the statute is ambiguous, Congress must cure that ambiguity, not the federal courts. Cargill, 2023 U.S. App. LEXIS 344, at 6. Wherefore, Mr. Alicea respectfully asks that this Court find that the definition of "machinegun" as set forth in the *National Firearms Act* and *Gun Control Act* does not apply to the forced reset triggers at issue. Alternatively, if the Court were to reject this conclusion, Mr. Alicea respectfully asks that it determine that the statutory definition is ambiguous. In which case, the rule of lenity would therefore compel this Court to construe the statute in Mr. Alicea's favor.

In addition, Mr. Alicea respectfully submits that ATF's Open Letter, the basis upon which the Government considers the forced reset triggers in question to be machineguns, violates Section 706 of the Administrative Procedure Act, 5 USC §706, insofar as it constitutes an agency action in excess of its statutory authority. Lastly, Mr. Alicea respectfully asks that this Honorable Court determine that the Government cannot establish the necessary *mens rea* element to achieve his conviction.

## III.   ARGUMENTS

4

### A.  *Forced reset triggers do not meet the statutory machinegun definition*

The *Gun Control Act of 1968* provides that "it shall be unlawful for any person to transfer or possess a machinegun". 18 USC § 922(o)(1). The Act defines machinegun as follows:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. 26 USC § 5845(b); see 26 USC § 921(a)(24).

The traditional example of a machinegun is a rifle capable of automatic fire, like the M-16. Semi-automatic rifles like the AR-15 are not machineguns. See, Hollis v. Lynch, 827 F.3d 436, 440 n. 2 (5th Cir. 2016). To understand what a machinegun is, it is helpful to understand what a machinegun is not. Cargill, 2023 U.S. App. LEXIS 344, at 7. To that end, the firing mechanism of a semi-automatic weapon is especially important. The relevant parts are as follows:



The trigger is the interface between the gun's internal mechanism and the human finger. The sear is the trigger's top-forward geometric plane, which locks snugly into a groove near the spring of the hammer. The hammer is the spring-loaded element that strikes the firing pin, causing ignition of the charge and propulsion of the bullet. The disconnector is a part that sits on top of the trigger and serves to reset the hammer after a round is fired; this resetting is what makes a semi- automatic weapon semi-automatic. Cargill, 2023 U.S. App. LEXIS 344, at 8. The mechanics of the firing process are as follows. First, the user pulls the trigger. Doing so disengages the hammer from the sear, allowing the spring to swing the hammer to strike the firing pin, which causes the charge to combust and propel the bullet.

---

[5] Cargill, 2023 U.S. App. LEXIS 344, at 7.

The firing of the bullet thrusts the bolt backward, which kicks the hammer into the disconnector on top of the still-depressed trigger. When the trigger is reset, the hammer is pulled back into the cocked position and secured by the trigger's sear as it slips off the disconnector. The user may then fire again by pulling the trigger, without having to manually re-cock the hammer. The mechanics are viewed below:



The end result is that the user of a semi-automatic firearm can fire rapidly by means of repeated use of the trigger. <u>Cargill</u>, *supra*. Critically, use of the trigger necessarily corresponds one-to-one with bullets fired. That is, a single pull of the trigger results in a single bullet fired. Without resetting the trigger, the disconnector cannot reset the hammer to the fully cocked position. And unless the hammer is fully cocked, it will not be able to strike the firing pin with sufficient force to discharge the weapon a second time. (When a weapon fails to fire for this reason, it is said to experience a "hammer follow" malfunction.) In sum, both the hammer and the trigger- disconnector must invariably return full circle before another round can be dispatched. <u>Cargill, 2023 U.S. App. LEXIS 344, at 9.</u>

This process may be contrasted with a fully automatic gun, which is equipped with something called an "auto sear"—a device that serves to re-cock and release the hammer in tandem with the motion of the bolt for so long as the trigger remains depressed. In other words, the auto sear enables a pendulum swing of the hammer in sync with the bolt without any further input from the user; with one pull of the trigger, an automatic weapon can shoot continuously until ammunition is depleted. <u>Cargill</u>, *supra*. The statutory definition of a machinegun also includes devices that convert an ordinary firearm into a machinegun. See, <u>Cargill, 2023 U.S. App. LEXIS 344, at 9-10,</u> citing, <u>United States v. Camp, 343 F.3d 743 (5th Cir. 2003)</u>

---

[6] This figure is a stationary image taken from an animated graphic that moves to display the relevant motion. The moving image may be found here: https://www.ca5.uscourts.gov/opinions/pub/20/20- 51016_ar15.gif.

(holding that a switch—which, if flipped, would cause a semi-automatic rifle to fire continuously—is a device that turns an ordinary firearm into a machinegun). The issue presented here is whether the forced reset triggers possessed by Mr. Alicea, or any other one for that matter, are such a device.

Firing a semi-automatic rifle equipped with a forced reset trigger, similar to the Alamo-15 on Mr. Alicea's pistols**,** works as follows; the cycle of operation begins when the shooter functions the trigger and fires the round. *See, Rare Breed Triggers, supra*, Docket No. 1, *Complaint* ¶ 92. As the round passes the gas port, most of the gas from the explosion of the round is vented through the gas tube and that force begins the process of sending the bolt carrier to the rear of the firearm. *Id*, at ¶ 93. When that process starts, the bolt then unlocks and the brass of the spent cartridge is then extracted from the chamber and ejected from the firearm. *Id*, at ¶ 94. Like all AR-15 firearms, as the bolt carrier moves to the rear, it cocks the hammer of the firearm. *Id*, at ¶ 95.

For example, in Rare Breed's FR-T 15 patented design, as the bolt carrier cocks the hammer, the force of the cocking hammer also forces a reset on the trigger by pushing the trigger forward and making the trigger ready to function again. **The subsequent firing of another round of ammunition cannot occur without the shooter functioning the trigger again**. *See, Rare Breed Triggers, supra*, Docket No. 1, *Complaint* ¶ 96. This is referred to as a "forced reset" and it is this forced reset that makes the Rare Breed's FR-T 15 legal under the NFA and GCA because **it requires a separate and independent function of the trigger by the shooter in order to expel another round of ammunition, i.e., the trigger is forced to mechanically reset itself and must be functioned again before it can fire an additional round.** *Id*, at ¶ 97.

Simultaneously, as Rare Breed's FR-T 15 trigger is forced into its reset position, a locking bar, which is part of the trigger assembly, pivots into position and mechanically locks the trigger forward. This is what prevents the trigger from functioning again, regardless of the amount of force applied to the trigger, until the cycle of operation is complete. *See, Rare Breed Triggers, supra*, Docket No. 1, *Complaint* ¶ 98. Continuing through the cycle, the buffer spring behind the bolt carrier pushes the bolt carrier forward which is what feeds a new round of ammunition into the chamber from the magazine. That new round of

ammunition is forced into the chamber as the bolt closes and locks into place. See, Rare Breed Triggers, *supra*, Docket No. 1, *Complaint* ¶ 99.

It is only after the bolt begins to lock into place inside the chamber and the locking bar is disengaged that the trigger can function again to fire/expel another round of ammunition upon the subsequent function of the trigger. See, Rare Breed Triggers, *supra*, Docket No. 1, *Complaint* ¶ 100. **Until the trigger is functioned again, the firearm will not and cannot fire another round. In fact, if sufficient force were placed on the trigger to the rear in an attempt to overcome the forced reset function, the firearm will cease operation.** *Id.* Because the forced reset triggers like Rare Breed's FR-T 15 and the Alamo-15 require a separate rearward function of the trigger for each discharge of the firearm, they cannot be defined as "machinegun".

While forced reset triggers certainly allow for a more rapid subsequent firing of the next round by the firearm, it does not allow more than one round of ammunition to be expelled per single function of the trigger, and therefore it does not meet the definition of a "machinegun" under the above-cited laws. See, Rare Breed Triggers, *supra*, Docket No. 1, *Complaint* ¶ 101. Mr. Alicea would like the Honorable Court to take special notice of the mechanics of the forced reset triggers as the Government will try to entice it into an unwarranted analysis, to wit; the fire rate of the weapon. This was one of the Government's arguments in Cargill, *supra,* and it seems to be one here. The Cargill court rejected the Government's contention and stated the following:

> The Government says that this straightforward interpretation defies common sense. It would not have been prudent for Congress to "zero[] in on the mechanistic movement of the trigger," the Government says, because the problem sought to be remedied was "the ability to drastically increase a weapon's rate of fire". <u>Aposhian v. Barr, 374 F. Supp. 3d 1145, 1152 (D. Utah 2019)</u> Perhaps Congress's choice of words was prudent, or perhaps it was not. That is not for us to decide. But the Government's objection only accentuates the fact that Congress did not use words describing the shooter's perspective or the weapon's rate of fire. See Alkazahg, 81 MJ 781 ("Congress could have suggested that a shooter-focused approach or even a rate-of-fire approach was the way to read the statute by enacting those words. Even the term 'machine gun' suggests a mechanical approach where the shooter interaction is extremely limited."). Instead, it made up an entirely new phrase—by a single function of the trigger—that specifically pertains to the mechanics of a firearm. Prudent or not, Congress defined the term "machinegun" by reference to the trigger's mechanics. We are bound to apply that definition as written.

After all, "Congress did not prohibit machineguns according to how quickly they fire. It prohibited machineguns according to the way that they fire". <u>Cargill, 2023 U.S. App. LEXIS 344, at 9-10</u>.

Furthermore, the Court should note that multiple weapons experts, all of which are former ATF special agents, have reviewed a forced reset trigger (FR-T 15) and have determined that it is not machineguns for statutory purposes. Most notably:

1) Kevin P. McCann, esq, is a former ATF Resident Agent in Charge, retiring from ATF after 25 years of service;[7]

2) Daniel O'Kelly, former Senior Special Agent and the Chief Firearms Technology Instructor at ATF National Academy;[8]

3) Rick Vasquez, former ATF Special Agent and Former Acting Chief of the Firearms Technology Branch;[9]

4) Brian Luettke, former ATF Special Agent with 22 years' experience, and an instructor at ATF's National Academy where he taught the application of the GCA and the NFA relating to identifications and classifications.[10]

These four experts, with over 100 years of combined law enforcement experience, are well known to the Government and the ATF. This is not only because of their former employment as ATF special agents, but also because the DOJ and ATF has presented each of them as experts in their own cases and criminal prosecutions on the subject of what does and does not constitute a "machinegun" under federal law. Moreover, as we previously mentioned, in 2013 the ATF examined a similar trigger attachment, namely, the Tac-Con 3MR trigger, which is also designed for use in semiautomatic firearms and concluded that the 3MR trigger does not convert a semiautomatic firearm into a "machinegun." Nonetheless, Mr. Alicea is now being prosecuted and exposed to the deprivation of his liberty based on ATF's erroneous interpretation. This is one of the reasons why dismissal is proper in this case. The latter is true, because ATF lacks the authority to issue the Open Letter in question because its interpretation of machinegun conflicts with the unambiguous statutory definition.

And even if the statute is ambiguous, it should be construed in Mr. Alicea's favor because of the rule of lenity. Furthermore, because the rule at issue is an Open Letter, the Government's interpretation is

---

[7] A true and correct copy of McCann's Opinion Letter regarding Rare Breed's FR-T 15 FRT which also contains his professional experience is attached hereto as Exhibit C.
[8] A true and correct copy of O'Kelly's Opinion Letter regarding Rare Breed's FR-T 15 FRT which also contains his professional experience is attached hereto as Exhibit D.
[9] A true and correct copy of Vasquez's Opinion Letter regarding Rare Breed's FR-T 15 FRT which also contains his professional experience is attached hereto as Exhibit E.
[10] A true and correct copy of Luettke's Opinion Letter regarding Rare Breed's FR-T 15 FRT which also contains his professional experience is attached hereto as Exhibit F.

not entitled to deference under Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 US 837 (1984). See, United States v. Mead Corp, 533 US 218 (2001).

**B.**  **The Machinegun statutory definition does not unambiguously mean what the Government intends it to mean**

Four circuit courts have agreed that the definition of machinegun within the *National Firearms Act* and *Gun Control Act* does not unambiguously include Bump Stocks.[11] The same is applicable with forced reset triggers. The latter is so because under the best reading of the statutory language, a forced reset trigger is not a machinegun. In evaluating the statute at hand for ambiguity, the Court's primary task is to interpret the meaning of machinegun as defined in 26 USC § 5845(b) by employing traditional statutory interpretation rules. Guedes v. BATFES, 140 S. Ct. 789, at 790 (2020).

Recall that in this circumstance, Congress has defined machinegun to mean "any weapon which shoots . . . automatically more than one shot . . . by a single function of the trigger," or any accessory that allows a firearm to shoot in that manner. 26 USC §5845(b). The contested issue in this case is whether the fire created by a semi-automatic rifle, or, in this case pistols, equipped with a forced reset trigger is produced both "automatically" and "by a single function of the trigger." We will now discuss those components in reverse order.

### *a.   The phrase "by a single function of the trigger"*

---

[11] "Three of our sister circuits have reviewed preliminary- injunction motions relating to the Final Rule…each circuit that has addressed them agrees that the definition of machinegun within the *National Firearms Act* and *Gun Control Act* does not unambiguously mean what the Government says it means. Cargill, 2023 U.S. App. LEXIS 344, at 18.

"Nor can we say that the statutory definition unambiguously supports the Government's interpretation. As noted above, we conclude that it unambiguously does not". *Id.*, at 8.

Moreover, as to what the Government "meant", the Final Rule in Cargil, like the Open Letter in this case with respect to FRTs, intended to interpret the term "machinegun" as including bump-stock type devices. To that end the Final Rule read as follows:

> The term "machinegun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

[5a] On a separate note: A Bump Stock is another firearm accessory that effectively increases the rate of fire of a semi-automatic rifle. It is "[a] part that can be attached to the handle of a gun that makes it able to fire repeatedly more quickly, in a *similar* way to an automatic weapon". Cambridge Dictionary; https://dictionary.cambridge.org/dictionary/english/bump-stock

At the time the statute was passed, "function" meant "action." Webster's New International Dictionary 1019 (2d ed. 1934); See, Cargill, 2023 U.S. App. LEXIS 344, at 22, citing Guedes, 920 F.3d at 43. (Henderson, J., concurring in part and dissenting in part). Thus, the relevant question is whether a semi-automatic rifle equipped with a force reset trigger fires more than one shot each time the trigger "acts." It does not. A semi-automatic weapon utilizes a simple mechanical process: the trigger disengages the hammer from the sear, the hammer strikes the firing pin, the bullet fires, and the recoil pushes the hammer against the disconnector, which resets the trigger. This process happens every single time one bullet is fired. Cargill, supra. To be sure, forced reset triggers increases the rate at which the process occurs. But the fact remains that only one bullet is fired with each function of the trigger.

The statutory definition of machinegun utilizes a grammatical construction that ties the definition to the movement of the trigger itself, and not the movement of a trigger finger. Cargill, 2023 U.S. App. LEXIS 344, at 25. Context firmly corroborates what grammar initially suggests by demonstrating that Congress knew how to write a definition that is keyed to the movement of the trigger finger if it wanted to. But it did not. Id. Therefore, the court is obliged "to conclude that the statutory definition of machinegun unambiguously turns on the movement of the trigger and not a trigger finger". Id.

Grammar rejects a reading based on the shooter's perspective. Cargill, 2023 U.S. App. LEXIS 344, at 26. Each component of the statutory definition supports the mechanical perspective, not a shooter's perspective. Id. "Again, the definition reads as follows: "[M]achinegun means . . . any weapon which shoots . . . automatically more than one shot . . . by a single function of the trigger." 26 USC § 5845(b). The subject of the sentence, of course, is machinegun. The linking verb *means* connects the subject to the subject complement—*weapon*. Next, the adjectival phrase *which shoots* modifies *weapon*. The adverbial phrase *automatically more than one shot* then modifies *shoots*. Finally, two prepositional phrases follow. The first, *by a single function*, modifies the adverbial phrase. The second, *of the trigger*, modifies the first prepositional phrase. Id., citing, Guedes, 920 F.3d at 44 n.13. (Henderson, J., concurring in part and dissenting in part).

"The first thing to note is that the ultimate subject is *machinegun*, and the subject complement is *weapon*. In other words, a machinegun is defined by reference to what kind of weapon it is. But identifying the subject of the sentence is only the first step". <u>Cargill,</u> *supra*. Then, as a second step, the Court must look, "to the fact that the term weapon is defined by how it shoots. So, again, the definition refers to the device being made to shoot, not the person or thing doing the shooting. Third, the manner of shooting must be automatic. Fourth—and critically—the prepositional phrases define the firing process's requirements from a mechanical perspective. The process must occur by a *single function*, and the single act must be *by the trigger*. In short, there is no mention of a shooter. The grammatical structure continuously points the reader back to the mechanics of the firearm. The statute does not care what human input is required to activate the trigger—it cares only whether more than one shot is fired each time the trigger acts". <u>Cargill, 2023 U.S. App. LEXIS 344, at 26-7.</u>

Additionally, the Court should look to context for further clues on the statutes meaning. ([c]ontext is a primary determinant of meaning). Antonin Scalia & Bryan A. Garner, *Reading Law*: *The Interpretation of Legal Texts* 167 (2012). "[C]ontext confirms that the statute must be read from the mechanical perspective". <u>Cargill</u>*, supra*. "Specifically, context tells us that Congress knew how to write a definition that explicitly turns on the action of a shooter rather than the action of a trigger, but chose not to do so here. Immediately following the definition of machinegun provided in 26 USC § 5845(b), Congress defined the term "rifle" to mean a weapon designed to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger". <u>Cargill, 2023 U.S. App. LEXIS 344, at 28,</u> and § 5845(c).

The statute next defines "shotgun" to mean a weapon designed "to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger." *Id*. § 5845(d). '[W]here the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.'". <u>Cargill</u>, *supra*; *Reading Law* at 170. To summarize, the definition of machinegun must turn on the action (or "function") of the trigger because no other actor is mentioned or implied. This conclusion is only

strengthened by the fact that other definitions within the same statutory provision explicitly turn on the action of a shooter, showing that Congress knew how to write a definition that proceeds from a shooter's perspective, rather than a mechanical one, if it had wanted to. The notion that the definition turns on the action of an unnamed shooter is inconsistent with both the grammatical and statutory contexts. Cargill, 2023 U.S. App. LEXIS 344, at 28-9.

### b.   The meaning behind "automatically"

Even if a forced reset trigger caused a semi- automatic rifle to operate by a single function of the trigger, "the rifle would still need to operate automatically in order to be a machinegun for statutory purposes". Cargill, 2023 U.S. App. LEXIS 344, at 31. Generally, automatically means "self-acting." Oxford English Dictionary at 574 ("[s]elf-acting under conditions fixed or it, going of itself"); see also Cargill, 20 F.4th at 1012; Guedes, 920 F.3d at 30; id. at 43 (Henderson, J. concurring in part and dissenting in part); Aposhian, 958 F.3d at 986; Aposhian 989 F.3d at 895 (Tymkovich, C.J., dissenting); Gun Owners of America, 19 F.4th at 905-06 (White, J., in support of affirmance); id. at 912-13 (Murphy, J., in opposition to affirmance).

However, in the case at hand the Court should note that the firing process enabled by a forced reset trigger is not self-acting. As an initial matter, Mr. Alicea confers that the phrase "by a single function of the trigger" modifies the adverb "automatically". "Thus, the condition is satisfied only if it is the trigger that causes the firearm to shoot automatically". Cargill, 2023 U.S. App. LEXIS 344, at 31, citing, Guedes, 920 F.3d at 43 (Henderson, J., concurring in part and dissenting in part) ("'Automatically' cannot be read in isolation. On the contrary, it is modified—that is, limited—by the clause 'by a single function of the trigger.'"). That is not how a forced reset trigger works.

Firing with a semi-automatic rifle equipped with a forced reset trigger does not maintain if all a shooter does is initially pull the trigger. Rather, to continue the firing after the shooter pulls the trigger, a forced reset trigger requires a separate and independent reset and function of the trigger for each round fired. The only thing a forced reset trigger does is enable a shooter to accomplish a faster follow-up shot because of the speed at which the trigger resets and can be functioned again. Nonetheless, The Government

will likely argue that, taken together, those actions create automatic fire. However, that argument must fail because it untethers "single function of the trigger" from "automatically". Cargill, 2023 U.S. App. LEXIS 344, at 34. Restated, the statute requires that a machinegun be capable of firing automatically once the trigger performs a single function. "An automatic weapon satisfies this requirement because the act of pulling and holding the trigger is one function, and that function produces more than one shot". *Id.*

In sum, the definition of machinegun as set forth in the *Gun Control Act* and *National Firearms Act* "establishes two conditions that must obtain in order for a weapon to qualify. The weapon must operate 'automatically' and 'by single function of the trigger'". Cargill, 2023 U.S. App. LEXIS 344, at 36. In that regard, the Court should deem the statute in question as not ambiguous. Hence, according to the statute's unambiguous language, neither condition obtains as applied to a semi-automatic rifle equipped with a forced reset trigger like the ones Mr. Alicea possessed. The failure to meet either condition is sufficient to entitle him to dismissal.

## C.  *Assuming arguendo that the relevant statute is ambiguous the Rule of lenity must apply*

Turning to the rule of lenity, and assuming *arguendo* that the Court finds the relevant statute to be ambiguous, it should consider whether that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity. Rewis v. United States, 401 US 808, 812 (1971). Some courts have concluded that the rule of lenity applies if the statute is ambiguous. Cargill, 2023 U.S. App. LEXIS 344, at 47. Generally, courts have considered two standards for whether a statute is sufficiently ambiguous to trigger the rule of lenity. One standard asks whether there is a "reasonable doubt" as to the statute's meaning. See, *Reading Law* at 299 (quoting Moskal v. United States, 498 US 103,108 (1990). The other one inquires whether there is a "grievous ambiguity" in the statute. See Chapman v. United States, 500 US 453, 463 (1991).

The Supreme Court does not appear to have decided which of these standards governs the rule of lenity. See Wooden v. United States, 142 S. Ct. 1063, 1075 (2022). (Kavanaugh, J., concurring) (arguing in favor of the grievous-ambiguity standard). But it does not matter which standard applies because the rule of lenity applies even under the more stringent "grievously ambiguous" condition. One formulation of that

standard provides that lenity applies if a court cannot discern the statute's meaning even "after seizing everything from which aid can be derived". Wooden, at 1075.

Assuming that the statute at issue here is ambiguous, the Court can only "guess" at its definitive meaning. Cargill, *supra*, citing, United States v. Suchowolski, 838 F.3d 530, at 535 (5th Cir. 2016). Throughout this motion Mr. Alicea has discussed "all the traditional tools of statutory construction, and in this circumstance, they fail to provide meaningful guidance". Cargill, 2023 U.S. App. LEXIS 344, at 48. "That is sufficient to require application of the rule of lenity irrespective of whether the reasonable doubt or grievous ambiguity standard applies". *Id*. After attempting to make sense of a statute using every other tool, if the Court faces an unbreakable tie between different interpretations, it must declare it to be ambiguous. *Id*.

That is the case here in two respects. First, "a single function of the trigger" may refer to the firearm's mechanics or to the shooter's pulling of the trigger. Second, if the process whereby a forced reset trigger forces a reset on the trigger by pushing the trigger forward and making the trigger ready to function again allows for "automatic" fire. If after having utilized all available tools of statutory interpretation, the Court finds the statute to be ambiguous, it will be confronted by an unbreakable tie. That, in and of itself, would be sufficient to conclude that this statute is grievously ambiguous and give way for the application of the rule of lenity. Cargill, 2023 U.S. App. LEXIS 344, at 48-49.

To apply lenity in this case preserves the separation of powers "by maintaining the legislature as the creator of crimes". Cargill, 2023 U.S. App. LEXIS 344, at 50, citing, Esquivel Quintana v. Lynch, 810 F.3d 1019. "If ATF could change the scope of criminal liability by issuing a regulation—free from the taxing obligations of bicameralism and presentment—the Executive could wield power that our Constitution reserves to the Legislature". Cargill, *supra*. The rule of lenity also prevents the possibility whereby Congress passes an ambiguous criminal statute, only to be interpreted later by a federal agency. Cargill, *supra*, citing Esquivel Quintana, at 1019. ("By applying lenity in this setting, last of all, courts would avoid incentivizing Congress to enact hybrid statutes that duck under lenity's imperatives, to say nothing of other imperatives in construing criminal laws.").

In fact, "it would be inconsistent with our constitutional structure to apply lenity in an unprincipled manner to statutes that are not really ambiguous". <u>Cargill</u>, *supra.* But here, the Court should be persuaded as to the fact that, "if the definition of 'machinegun' does not unambiguously exclude forced reset triggers, its inclusion of the latter is at the very least ambiguous". *Id*. In this case, applying the rule of lenity aids the separation of powers, rather than impeding it.

"The rule of lenity is a 'time-honored interpretive guideline'". <u>Cargill, 2023 U.S. App. LEXIS 344, at 51,</u> citing <u>Liparota v. United States, 471 US 419, 429 (1985)</u>. The Supreme Court has previously applied the rule of lenity to construe ambiguous statutes against imposing criminal liability. See e.g., <u>United States v. Santos, 553 U.S. 507 (2008).</u> ("The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.").

This case should not be different: assuming the definition of machinegun is ambiguous, the Court is bound to apply the rule of lenity. That is, the Court is bound to construe the definition of machinegun to exclude a semi-automatic weapon equipped with a forced reset trigger. See, <u>Alkzahg, 81 MJ at 784</u>. ("We decline to step into the role of the legislature when the legislature has not been clear about whether Appellant's conduct was criminal. Judge Henry Friendly described the rule of lenity as 'the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should.' Here, we express that distaste.") (quoting <u>United States v. Bass, 404 US 336, 348 (1971)</u>).

Therefore, if the Court finds the statute to be ambiguous, it should conclude that the rule of lenity demands it to resolve that ambiguity in favor of Mr. Alicea, and in turn conclude that a forced reset trigger is not a machinegun for purposes of the NFA and GCA.

### D.  <u>ATFs' Open Letter is in violation of Section 706 of the Administrative Procedure Act.</u>

Pursuant to 5 USC §702 of the *Administrative Procedure Act* (APA) any person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. Moreover, pursuant to 5 USC §706, this Court may hold unlawful and set aside agency action, findings, and conclusions found to be: A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; B) contrary to constitutional

right, power, privilege, or immunity; C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; D) without observance of procedure required by law.

In this case, ATFs' Open Letter is invalid because it was issued without statutory authority under the NFA or the GCA. Neither the Government or the ATF are empowered by the NFA, the GCA, or any other Federal Statute to promulgate any rule expanding and/or otherwise amending the definition of "machinegun" in the NFA or GCA. What is more, neither the Government, nor the ATF are empowered by the NFA, the GCA, or any other Federal Statute to promulgate any rule which creates new criminal offenses, which is the purpose and effect of the Open Letter in question.

Simply put, the Open Letter is contrary to ATF's rulemaking authority under 18 USC §926(a) and 26 USC §7805(a), which only provides the Attorney General ("AG") and the ATF with the ability to make rules necessary for the enforcement of the provisions of the NFA and GCA, not the power to amend the NFA or GCA or the power to create new criminal offenses. Expanding and/or amending the definition of "machinegun" under the NFA and/or GCA is the sole province of Congress, which Congress did through the GCA in 1986. If the "machinegun" definition is to be amended or expanded, it must be done by Congress, not through the AG or the ATF. The Open Letter is therefore not in accordance with law or exceeds statutory authority. The illegitimate Open Letter is the claimed legal basis for ATF's misclassification of the forced reset triggers as a "machinegun" and seems to consist of its final agency action in that regard.

Furthermore, the Open Letter is invalid because the definition of "machinegun" in the NFA and GCA is unambiguous, meaning Congress left no room for the Government or the ATF to fill through rulemaking. In NFA and GCA's definition, Congress spoke to the precise question at issue (what is a "machinegun"?) and the intent of Congress is clear. The Government and ATF have an obligation to respect and enforce the plain definition of "machinegun" in the NFA and GCA, which they did for decades in countless prosecutions opposing contentions that the definition is ambiguous.

ATF has no authority to expand the statute's definition through the Open Letter. Further, the Open Letter is invalid because it contradicts the unambiguous definition of "machinegun" in the NFA and GCA.

Congress' use of the phrase "single function of the trigger" has a precise meaning, and if not precise, a meaning easily found by resorting to ordinary rules of statutory construction.

The Government and the ATF may not interpret, "single function of the trigger" to encompass forced reset trigger like the ones at issue because they simply do not fall within that statutory definition. Congress gave the latter phrasing a precise meaning, and that meaning may not be extended through ATF's illegal Open Letter. The Open Letter is therefore not in accordance with law or exceeds statutory authority. Mr. Alicea has and will continue to suffer legal wrongs and be adversely affected by the actions taken by the ATF in reliance on, and enforcement of the Open Letter in question. Namely, Mr. Alicea is exposed to losing his right to liberty and serve prison time due to the ATF's misclassification of forced reset triggers.

### E.  *The Government cannot establish Mr. Alicea's mens rea.*

If all of the above were not sufficient, the Government's case against Mr. Alicea must fail because it cannot establish the necessary *mens rea* requirement under <u>Staples v. United States, 511 U.S. 600 (1994)</u>. The statute under discussion, 18 USC §922(o), provides in relevant part that "it shall be unlawful for any person to transfer or possess a machinegun." Although ownership of the weapon is not required for conviction, mere possession of the weapon is insufficient. See, <u>United States v. Escobar-De Jesus, 187 F.3d 148, 176 (1st Cir. 1999)</u>.

The government must also prove that the defendant knew the weapon "had the characteristics that brought it within the statutory definition of a machinegun". <u>Staples, 511 U.S. at 602</u> (discussing a prosecution under 26 U.S.C. §5861(d) for possession of a machine gun). Pertinently, the Government's burden is to prove that Mr. Alicea had knowledge of the characteristics that brought the gun within the statutory definition. See *Id*.

As we have discussed *ad nauseam*, a machinegun is defined as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger". 26 USC §5845(b); see also 18 USC § 921(a)(23). Staples scienter requirement also applies to prosecutions under 18 USC §922(o). See <u>Rogers v. United States, 522 US 252, 254 n.1 (1998).</u>

One of the rationales relied on in Staples for the *mens rea* requirement was the potentially harsh penalty for violations of 26 USC §5861(d), that is, up to ten years imprisonment. 511 U.S. at 616. The penalty for violating 18 USC § 922(o) can also include a prison term of up to ten years. See 18 USC §924(a)(2). In this case, the question is whether the Government can prove that Mr. Alicea knew that the firearms in question had the characteristics that brought them within the statutory definition. For the reasons explained throughout this motion, and the ones that fallow, the answer must be a resounding no.

As we have previously stated, Mr. Alicea is a *bona fide* registered firearms licensee in the state jurisdiction of Puerto Rico. Mr. Alicea legally purchased the commercially available Sharp Brothers pistol, model Jack-9 and the Zev Technologies pistol, model ZEV-FL. Subsequently, Mr. Alicea learned of the commercial availability of FRTs. Note that these FRTs are readily available for sale in the open market at the time that this motion is being submitted.[12] At all times Mr. Alicea was under the reasonably informed impression that FRTs would increase the pistols rate of fire, but that they were legal under federal law. Hence, Mr. Alicea went ahead and purchased the commercially available Alamo-15 FRTs under discussion.

The Government's concentrated effort on its unreasonable enforcement of 18 USC §922(o) is based solely on the ATF's misclassification of FRTs as a "machinegun" through an Open Letter. However, Mr. Alicea had no knowledge of the issuance of this Open Letter as the ATF did not follow any formal or informal rulemaking procedure that would enable him to gain knowledge of its erroneous classification. The general rule is that the requisite *mens rea* may be established by circumstantial evidence. See, Staples, 511 U.S. at 615 n.11. Therefore, the Government may intend to prove this element by alluding to Mr. Alicea's inferred knowledge that the weapon was automatic due its increased rate of fire.

Yet, as we have explained, the statute does not criminalize rate of fire, but only those firearms capable of firing automatically with a "single function of the trigger". Mr. Alicea was under the reasonably informed impression that firearms equipped with FRTs would only fire upon multiple functions of the trigger, therefore stepping outside the statutory definition of machinegun.

---

[12] **Opticsplanet.com**; https://www.opticsplanet.com/powered-by-graves-alamo-15-positive-displacement-trigger.html
**Gunsforsale.tech**; https://gunsforsale.tech/product/alamo-15/

Hence, the Government is incapable of showing that Mr. Alicea knew the weapon "had the characteristics that brought it within the statutory definition of a machinegun." Staples, 511 U.S. at 602. Importantly, Mr. Alicea does not possess any expertise in firearms, and he obtained his firearms license recently on May 3rd, 2022.  Cf. United States v. Backer, 362 F.3d 504, 507 (8th Cir. 2004) (sustaining conviction where the defendant was a firearms collector); United States v. Morgan, 216 F.3d 557, 567-68 (6th Cir. 2000) (sustaining conviction where the defendant was a "gun enthusiast" and had admitted knowing that automatic weapons have three selector switches).

Additionally, this is not a case where the circumstances "would make the regulated characteristics of the weapon immediately apparent." Staples, 511 U.S. at 615 n.11. To the contrary, FRTs do not operate with a "single function of the trigger" and were marketed as such. In Mr. Alicea's view, the evidence is simply insufficient to establish that he knew that the occupied pistols possessed the characteristics of an automatic weapon. No reasonable finder of fact can reach a guilty verdict on the machinegun charge where the firearms in question simply do not comply with the statutory definition. Finally, Mr. Alicea refers *in extenso* to Justice Kavanaugh's concurring opinion in Wooden v. United States, 142 S. Ct. 1063 (2022). Advocating for the expansion of the doctrine of *mens rea* over the rule of lenity:

> I very much agree with Justice Gorsuch about the importance of fair notice in federal criminal law. But as I see it, that concern for fair notice is better addressed by other doctrines that protect criminal defendants against arbitrary or vague federal criminal statutes—in particular, the presumption of *mens rea*.
>
> The deeply rooted presumption of *mens rea* generally requires the Government to prove the defendant's *mens rea* with respect to each element of a federal offense, unless Congress plainly provides otherwise. See Rehaif v. United States, 588 U. S.         , 139 S. Ct. 2191, 204 L. Ed. 2d 594, 600 (2019); see also Flores-Figueroa v. United States, 556 U. S. 646, 652, 129 S. Ct. 1886, 173 L. Ed. 2d 853 (2009); W. Eskridge, *Interpreting Law: A Primer on How To Read Statutes and the Constitution* 350-351 (2016); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 303-312 (2012).
>
> **In addition, with respect to federal crimes requiring "willfulness," the Court generally requires the Government to prove that the defendant was aware that his conduct was unlawful.** See Bryan v. United States, 524 U. S. 184, 191-193, 118 S. Ct. 1939, 141 L. Ed. 2d 197 (1998); Cheek v. United States, 498 U. S. 192, 201-203, 111 S. Ct. 604, 112 L. Ed. 2d 617 (1991).
>
> To be sure, if a federal criminal statute does not contain a "willfulness" requirement and **if a defendant is prosecuted for violating a legal prohibition or requirement that the defendant honestly was unaware of and reasonably may not have anticipated, unfairness can result because of a lack of fair notice**.
>
> That scenario could arise with some *malum prohibitum* federal crimes, for example. But when that fair notice problem arises, one solution where appropriate could be to require proof that the defendant was aware that his conduct was unlawful. Alternatively, another solution could be to allow a mistake-of-law

defense in certain circumstances—consistent with the longstanding legal principle that an act is not culpable unless the mind is guilty. See <u>Morissette v. United States, 342 U. S. 246, 250-252, 72 S. Ct. 240, 96 L. Ed. 288 (1952).</u>

In this case Mr. Alicea was genuinely unaware of his actions being in any way in violation of federal law. Therefore, a grave and unfair injustice may result because of ATF's lack of *fair* notice. In fact, the mere exposure to a conviction is, in and of itself, a grave injustice against Mr. Alicea.

## IV.    CONCLUSION

Based on all of the abovementioned reasons, Mr. Alicea respectfully submits that the Superseding Indictment should be dismissed.

**RESPECTFULLY SUBMITTED**

In San Juan, Puerto Rico, on this day June 5th, 2023.

**I HEREBY CERTIFY** that on this date, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system which will send notification of such filing to all attorneys in the case.

*/s/Suzette Brito Santos*
**Suzette Brito Santos, Esq.**
USDC-PR 307411
103 Street Onix
Río Grande, PR 00745
787-423-7381
sbritolaw@gmail.com

*/s/Wilfredo Díaz Narváez*
**Wilfredo Díaz-Narváez, Esq.**
USDC-PR 215211
PO Box 31270San
Juan, PR 00929-2270
787-759-7269
Fax: 787-753-4598
attwdn@hotmail.com

*/s/Victor A. Ramos Rodriguez*
**Victor A. Ramos Rodriguez, Esq.**
USDC-PR 130202
PO Box 9465
Plaza Carolina Station
Carolina, PR 00988-9465
787-753-4241
Fax: 787-758-7189
abogpr@aol.com