IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WILMER ALICEA-CURRAS,<br><br>Defendant. | Criminal No. 22-511 (FAB) |

**UNITED STATES' RESPONSE IN OPPOSITION TO**
**MOTION TO DISMISS THE SUPERSEDING INDICTMENT**

The United States of America respectfully submits the following response to Defendant Wilmer Alicea-Curras ("Defendant")'s third Motion to Dismiss the Superseding Indictment.

I.   INTRODUCTION

Defendant is moving the Court to dismiss the indictment for a *third time*. *See* ECF Nos. 14, 43, and 119. As an initial matter, Defendant's motion raises similar arguments as his prior motions to dismiss the indictment that were denied by this Court. *See* ECF No. 51 ("Memorandum and Order"). For example, once again, Defendant explains how he believes that the forced reset triggers ("FRTs") "do not satisfy the statutory definition of a "machinegun" under 26 U.S.C. § 5845(b), as they do not modify the concerning firearms to shoot automatically more than one shot, without manual reloading, by a single function of the trigger." ECF No. 119 at 1. While Defendant did not address the Court's Memorandum and Order denying his previous motion, the Court's analysis and holdings remain true today. Pursuant to the Court's Memorandum and Order: (1) the superseding indictment is sufficient and sets forth the elements of the crime; (2) Defendant raises factual and evidentiary

1

arguments that are improper at the motion to dismiss stage; and (3) it is unnecessary for the Court to consider at this stage whether ATF's Open Letter affected its interpretation and administration of the 18 U.S.C. § 922(o) as applied to FRTs. *See* ECF No. 51.

Here, Defendant attempts to mask a question of fact as a question of law so that he may challenge the superseding indictment in a motion to dismiss. Defendant invoked this strategy in his prior motions to dismiss. For example, the Court noted in its Memorandum and Order denying Defendant's prior motion to dismiss, Defendant "goes into specific detail on the mechanical function of the triggers, lists several weapons experts who supposedly agree that firearms with forced reset triggers are not machineguns, and analyzes the statutory definition of machinegun as applied to the manner in which forced reset triggers function." ECF No. 51 at 2. Moreover, Defendant again claims that the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) exceeded its statutory authority with an ATF Open Letter and the "legal justification for considering FRTs as machineguns would collapse" without it. ECF No. 119 at 9. According to Defendant, the holding of *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) overturned the *Chevron* doctrine and thus administrative agencies like ATF are no longer permitted to interpret statutory terms like "machinegun." *Id.* at 22-24. In support of his request, Defendant also cites to *Garland v. Cargill*, 602 U.S. 406 (2024) which held that bump stocks are not considered machineguns.

Defendant's motion should be denied for two reasons. First, Defendant is limited to the facts contained in the superseding indictment, and it is black-letter law that the facts alleged in an indictment should be taken to be true when analyzing a motion to dismiss. Second, Defendant's reliance on the overturned *Chevron* doctrine and on *Cargill* are misplaced because ATF has not made any rules or interpretations of 18 U.S.C. § 922(o), and those cases

2

are distinguishable from the instant case. Third, Defendant possessed FRTs that are machineguns under federal law. Fourth, Defendant is seeking to re-litigate the law of the case. In *United States v. Moran*, 393 F.3d 1, 7 (1st Cir. 2004), the First Circuit held that "a legal decision made at one stage of a criminal or civil proceeding should remain the law of the case throughout the litigation, unless and until the decision is modified or overruled by a higher court." *Id*. at 50–51. While Defendant argues that certain aspects of its prior arguments should be viewed differently in light of intervening decisions in *Cargill* and *Loper Bright Enterprises*, the scope of these arguments is limited and much of Defendant's arguments are devoted to rehashing prior issues resolved by this Court.

## II. RELEVANT BACKGROUND REGARDING THE INDICTMENT

In or around 2022, ATF conducted an examination of FRTs that were being marketed and sold as replacement triggers. Afterward, on March 22, 2022, ATF issued an "Open Letter to All Federal Firearms Licensees" addressing their findings. *Id.* The Open Letter stated,

> ATF's examination found that some FRT devices allow a firearm to automatically expel more than one shot with a single, continuous pull of the trigger….Accordingly, ATF's position is that any FRT that allows a firearm to automatically expel more than one shot with a single, continuous pull of the trigger is a "machinegun", and is accordingly subject to the GCA prohibitions regarding the possession, transfer, and transport of machineguns under 18 U.S.C. §§ 922(o) and 922(a)(4).

ECF No. 119 at 29.

On or about October 8, 2022, following the execution of a federal search and seizure warrant, ATF Agents analyzed DVR videos from Mudafort Xtreme Sports Federal Firearms Licensee (FFL). ATF Agents observed in the videos an individual, later identified as Defendant, firing a firearm which appeared to be firing in fully automatic, meaning that the firearm was capable to fire more than one round by a single pull of the trigger. Subsequently,

3

following the execution of a second federal search warrant at Defendant's residence, ATF agents seized two firearms that were registered to Defendant and had been modified with a Powered By Graves (PBG) Alamo-15 FRTs. ATF conducted a field test and determined that the firearms were modified to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.

On December 1, 2022, a federal grand jury sitting in the District of Puerto Rico returned an indictment charging Defendant with two counts of possession of a machinegun in violation of 18 U.S.C. § 922(o). ECF No. 1. Specifically, Defendant was charged with possessing one Zev Technologies pistol, model ZEV-FL, bearing serial number ZFL09327, and one Jack-9, bearing serial number J9-03124, that had been modified with FRTs to fire more than one shot, without manual reloading, by a single function of the trigger. On April 20, 2023, a federal grand jury sitting in the District of Puerto Rico returned a superseding indictment charging Defendant with one count of possession of a machinegun in violation of 18 U.S.C. § 922(o) for the same firearms. ECF No. 28.

### III. APPLICABLE LAW

The First Circuit Court of Appeals has observed that "[w]hen a federal court uses its supervisory power to dismiss an indictment it directly encroaches upon the fundamental role of the grand jury. That power is appropriately reserved, therefore, for **extremely limited circumstances**." *Whitehouse v. United States District Court*, 53 F.3d 1349, 1360 (1st Cir. 1995) (emphasis added). Specifically, the First Circuit has cited to the Supreme Court to state the following:

> Ultimately, we can do no better than repeat what the Supreme Court said in a related context over 55 years ago: in the ordinary course of events, a technically sufficient indictment handed

4

> down by a duly empaneled grand jury "is enough to call for trial of the charge on the merits."

*United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011) (citing *Costello v. United States,* 350 U.S. 359, 363 (1956)).

Further, the only analysis that matters when addressing a motion to dismiss is whether the indictment contains sufficient factual allegations. An indictment is "a plain, concise, and definite written statement of the essential facts constituting the offense." Fed. R. Crim. P. 7(c)(1). An indictment only needs to allege facts supporting every element of the offenses charged. *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) (affirming the denial of a motion to dismiss an indictment because the motion "fails to attack the facial validity of the indictment and instead challenges the government's substantive case."). Moreover, "[o]n a motion to dismiss an indictment, a court takes the facts alleged in the indictment as true, mindful that "the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense."" *United States v. Chalwell*, No. CR 22-340 (FAB), 2023 WL 6346107, at *2 (D.P.R. Sept. 29, 2023) (*citing United States v. Savarese*, 686 F.3d 1, 7 (1st Cir. 2012)). *See also Ngige*, 780 F.3d at 502; *Guerrier*, 669 F.3d at 3-4; *United States v. Stepanets*, 879 F.3 367, 372 (1st Cir. 2018).

IV. **DISCUSSION**

    a. **Defendant is limited to the facts alleged in the superseding indictment which should be taken to be true for the purposes of analyzing a motion to dismiss.**

The Court issued a thorough Memorandum and Order addressing the applicable law for motions to dismiss and already held that the superseding indictment was sufficient. *See* ECF No. 51. Specifically, the Court held,

> The indictment here alleges the elements of the crime, namely that the pistols "were modified so that [they were] csapable of firing more than one shot, without manual reloading, by a single function of the trigger." At this stage, the government has met its burden[.]

*Id.* at 6-7 (internal citations omitted). Taking the facts alleged in the superseding indictment to be true, Defendant possessed two firearms which had been modified to function as machineguns. *See Savarese*, 686 F.3d at 7; *Ngige*, 780 F.3d at 502; *Guerrier*, 669 F.3d at 3-4; *Stepanets*, 879 F.3 at 372.

Moreover, the Court stated that a "court must deny a motion to dismiss if the motion relies on disputed facts. Alicea makes multiple factual assertions, but the government has not stipulated to these facts to allow the Court to decide, pre-trial, what may be the ultimate issue." ECF 51 at 6 (internal citations omitted). Thus, the Court held that "Alicea's arguments, at this stage, are unavailing." ECF 51 at 7. Here, Defendant disregards the Court's Memorandum and Order and instead, *for a third time*, provides the Court with his version of how FRTs function and argues that FRTs are not machineguns under law.

### b. Defendant's reliance on the overturned *Chevron* doctrine and on *Cargill* is misplaced.

Defendant asserts that the FRTs at issue do not satisfy the statutory definition of a machinegun under 26 U.S.C. § 5845(b), as they "do not modify the concerning firearms to shoot automatically more than one shot, without manual reloading, by a single function of the trigger." ECF 119 at 1. Defendant further asserts that after the Supreme Court's decisions *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024) and in *Garland v. Cargill*, 602 U.S. 406 (2024), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") "lacks the legal authority to reinterpret or redefine the statutory text of a machinegun beyond what Congress explicitly intended to include…." *Id.* at 2. Finally, while recognizing that the

6

statutory definition of a machinegun articulated in 26 U.S.C. § 5845(b) "is clear and unambiguous", Defendant again argues that the principle of lenity requires dismissal of the superseding indictment. *Id.* at 26.

However, the premises of Defendant's arguments are flawed. In *Cargill*, the Supreme Court considered the applicability of non-mechanical bump stocks to the statutory definition of a machinegun under 26 U.S.C. § 5845(b), and the propriety of an ATF regulation that classified bump stocks as machineguns. *Cargill*, 602 U.S. at 410-415. In *Loper Bright Enterprises*, the Supreme Court addressed an agency's rule in a civil matter and whether a court should defer to that agency's interpretation under the Administrative Procedure Act. *Loper Bright Enterprises*, 144 S. Ct. at 2256. Specifically, the Supreme Court in *Loper Bright Enterprises* addressed whether a court should defer to an agency's interpretation of an ambiguous statute, expressed in an agency rule, in a civil context under the Administrative Procedure Act. *Loper Bright Enterprises*, 144 S. Ct. at 2256, 2273. Here, Defendant is facing *criminal* proceedings because he was charged with possession of a machinegun in violation of 18 U.S.C. § 922(o)— not because of an Open Letter. As this Court previously noted, Defendant "devotes a section of his motion to dismiss in arguing that the ATF's interpretation of the statute via its open letter is a violation of the Administrative Procedure Act, a civil statute that governs the function of the administrative state." ECF No. 51 at 8. As the Court previously held, it need not and should not address the Open Letter on Defendant's motion to dismiss.

As in other cases, the superseding indictment in Defendant's case resulted from the Government's review and application of the statutory definition of a "machinegun." *See e.g., Rare Breed Triggers*, 690 F.Supp.3d at 75 (EDNY 2023) ("Each of these arguments thus depends in part on whether the FRT-15 satisfies the statutory definition of a machinegun

7

under federal law...."). Additionally, as the Supreme Court has recognized in *Cargill*, the term "machinegun" in 18 U.S.C. § 922(o), as defined in 26 U.S.C. § 5845(b), is clear. *Id.* at 410-411 (discussing the statutory definition of a machinegun.). The unambiguousness of the statutory definition was recognized by Defendant as well. ECF No. 119 at 26 ("The statutory definition of a 'machinegun' as articulated in 26 U.S.C. § 5845(b) is clear and unambiguous, as reaffirmed by the Supreme Court in *Garland*."). Consequently, neither decision requires nor supports the remedy sought by Defendant. Neither decision disturbs the law of the case established by this Court's prior decisions.

### c. The FRTs alleged to have been possessed by Defendant are machineguns under federal law.

18 U.S.C. § 921(a)(23) provides that the term "machinegun" has the meaning given such term in section 5845(b) of the National Firearms Act. 26 U.S.C. § 5845(b) in turn defines machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically, more than one shot, without manual reloading, by a single function of the trigger." The provision goes on to define the term to include, in pertinent part, "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun...." 26 U.S.C. § 5845(b). These parts and combinations of parts, are generally referred to a "machinegun conversion devices" or "MCDs".

The term "forced reset trigger" is not defined by statute. It is an unregulated, self-determinative industry term to describe a variety of devices intended to modify or convert semiautomatic firearms to achieve rates of fire comparable to, or exceeding those, of commercially manufactured machineguns. The manner in which this modification or conversion occurs may bring the device within the definition of "machinegun" provided in

8

26 U.S.C. § 5845(b). This determination requires a factual assessment of the technical operation and function of the device, and application of that those facts to the statutory definition. There are no federal rules or regulations classifying FRTs as machineguns, though ATF has long viewed devices operating on similar mechanical principles as those possessed by Defendant to be machineguns under federal law. Rather than supporting Defendant's arguments, *Cargill* confirms this long standing view.

As an initial matter, *Cargill* considered only the application of non-mechanical bump stocks equipped on firearms with standard semiautomatic triggers, and found that such devices were not machineguns under federal law. *Cargill*, 602 U.S. at 415. The alleged machinegun conversion devices at issue in this case are neither bump stocks, nor are they standard semiautomatic triggers. As the government intends to present to the jury and prove at trial, the MCDs possessed by Defendant completely replaced the trigger assemblies in the semiautomatic firearms possessed by Defendant, and modified the manner in which the firearms operated such that the firearms would "shoot[] … automatically, more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b).

*Cargill* explains a semiautomatic firearm with a standard trigger assembly, will fire "only one time" when the shooter "engag[es] the trigger," and "[t]he shooter must release and reengage the trigger to fire another shot." *Cargill*, 602 U.S. at 411-12. It is this manual "release" and "reengagement" that is the mechanical hallmark of semiautomatic firearm. In contrast, "[m]achineguns can ordinarily achieve higher rates of fire than semiautomatic firearms because the shooter does not need to release and reengage the trigger between shots." *Id.* at 412. In other words, with a semiautomatic firearm, the shooter must release the trigger to fire again; with a machinegun, the shooter must release the trigger to stop firing.

9

*Cargill* identifies several distinct mechanical components that will be present in a semiautomatic trigger assembly:

> The trigger is a simple lever that moves backward and forward. The square point at the top ledge of the trigger locks into a notch at the bottom of the hammer. The hammer is a spring-loaded part that swings forward toward the barrel and strikes the firing pin, causing a shot to fire. The disconnector is the component responsible for resetting the hammer to its original firing position after a shot is fired.

*Id.* at 417 (internal citations omitted). The Court then goes on to describe the cycle of operations in such a trigger:

> When the shooter engages the trigger by moving it backward … the square point of the trigger pivots downward…. This movement releases the spring-loaded hammer….
>
> At the top of the hammer's rotation, it strikes the firing pin, causing the weapon to fire a single shot.
>
> The firearm than ejects the spend cartridge from the chamber and loads a new one in its place. The mechanism that performs this task swings the hammer backward at the same time.
>
> As the hammer swings backward, it latches onto the disconnector. This latching … prevents the hammer from swinging forward again after a new cartridge is loaded into the chamber. The disconnector will hold the hammer in that position for as long as the shooter holds the trigger back, thus preventing the firearm from firing another shot.
>
> Finally, when the shooter takes pressure off the trigger and allows it to move forward … the hammer slips off the disconnector…. The trigger mechanism is thereby reset to the original position…. **A semiautomatic rifle must complete this cycle for each shot fired**.

*Id*. at 418-21 (emphasis added) (internal citations and illustrations omitted).

Importantly, in addition to noting that a semiautomatic firearm must complete this entire cycle for each shot fired, the Court stated that "this complete process is what constitutes

10

a 'single function of the trigger." *Id.* at 421. Thus, for purposes of the statutory definition of machinegun, a jury or a court must look to the entire firing cycle to determine whether a firearm "shoots, is designed to shoot, or can be readily restored to shoot, automatically, more than one shot, without manual reloading, by a single function of the trigger."

As noted by the Court in *Cargill*, the need for release and reengagement in a semiautomatic firearm results from the operation of a component called the "disconnector", which prevent the firearm from firing again by retaining the weapon's "hammer" (the component that strikes the firing pin for each shot) until the trigger is released. *Id.* at 419-21. The disconnector stops the firing cycle, requiring a separate and distinct function of the trigger to fire another shot. *Id.* at 420.

By contrast, a machinegun firing automatically does not use a disconnector. Machineguns instead employ a component called an "auto sear." The auto sear "catches the hammer as it swings backwards, but will release [the hammer] again once a new cartridge is loaded if the trigger is being held back." *Id.* at 420 n.4. Functionally, the auto sear briefly retains the hammer between shots to allow the weapon to safely reload, and then is automatically tripped by the "bolt carrier" of the weapon to fire the next shot. In this way, the auto sear serves two functions: (i) where present, it disengages the disconnector to allow automatic, continuous fire by a single function of the trigger; and (ii) it times the cycle of operation so that the hammer is released only when the next cartridge is properly chambered in order to avoid a malfunction.

The MCDs used to convert the firearms possessed by Defendant also eliminate the need for the shooter to release and reengage the trigger between shots. Instead, they convert a semiautomatic firearm by replacing the entire standard semiautomatic trigger assembly to

11

allow the shooter to engage the trigger only once to fire continuously. These devices have no disconnector to interrupt the firing cycle. When the shooter engages the trigger, the trigger assembly will continue the firing cycle, causing the weapon to fire more than one round, automatically, until the shooter disengages the trigger or the firearm's ammunition supply is exhausted. The devices achieve automatic fire through a component called the "Safety Disconnector with Roller"[1] which serves the same purpose as the auto sear. This component momentarily delays release of the hammer—timing the firearm as an auto sear would do—until the weapon is ready to be fired. Like an auto sear, the "Safety Disconnector with Roller" is tripped by the bolt carrier[2] to enable the subsequent shot. The chief difference between an auto sear and the "Safety Disconnector with Roller", is that while an auto sear retains the hammer directly, the "Safety Disconnector with Roller" does so indirectly by briefly restraining the movement of the trigger as the shooter continues the initial engagement. In a firearm equipped with one of these devices, the trigger moves as part of the automatic mechanical process of retaining and releasing the hammer.

Defendant's expert states the following:

> During the test firing, I recorded S/A Hunt from his left side shooting the firearms and I focused my attention on the **movement (function)** of the trigger. After S/A Hunt pulled the trigger rearward and fired a shot, his trigger finger moved forward along with the trigger to the reset position. This sequence of firing continued until he fired all of the rounds in the magazine.

---

1. Although the component is called the "Safety Disconnector with Roller", it is not the same component referenced by the Supreme Court in *Cargill* in its discussion of a standard semi-automatic trigger.
2. An M16 machinegun uses a machinegun bolt carrier which has a sear trip surface area that trips the automatic sear disengaging the hammer from the automatic sear. To function properly, the MCDs alleged to have been possessed by defendant must be used in a firearm equipped with a machinegun bolt carrier so the sear trip surface area may interact with the "Safety Disconnector with Roller" in the same manner as the automatic sear in a machinegun.

12

ECF No. 119 at 31 (emphasis added). Thus, while recognizing that the firearms converted with the MCDs alleged to have been possessed by Defendant continued firing until the Special Agent fired all the rounds in the magazine, Defendant's expert incorrectly equates the statutory meaning of "function of the trigger" with only the movement of the trigger, and without any consideration of the entire firing cycle, or whether that cycle, along with any resulting trigger movement, is occurring automatically without the manual "engagement", "disengagement", and "reengagement" that *Cargill* states would be present in a semiautomatic firearm. Said another way, to whatever extent the trigger moves during the firing cycle, such trigger movement is the result of the automatic operation of the unique firing cycle of these particular devices, which are not semiautomatic triggers. The Government intends to prove to the jury that once the trigger is engaged by the shooter, the converted firearm shoots, automatically, more than one shot, without manual reloading, by a single function of the trigger.

In support of his view that these MCDs are not machineguns, Defendant relies on a civil case in the Northern District of Texas which found that two types of FRTs, the Rare Breed Trigger FRT-15 ("FRT-15") and the Wide Open Trigger ("WOT") do not meet the statutory definition of a machinegun. *National Association for Gun Rights, Inc., et. al. v. Garland, et. al.*, __ F. Supp.3d __, 2024 WL 3517504 (NDTX July 23, 2024). Here as well, Defendant's reliance is misplaced.

The *NAGR* decision is not binding in this District and is currently on appeal in the Fifth Circuit. *See* Dkt. 24-10707 (filed August 1, 2024). Further, a close review of *Cargill* reveals that *NAGR* was wrongly decided in that that the Court based its conclusion on only one part of the firing cycle, rather than the entire firing cycle as directed by *Cargill*. *NAGR*,

13

2024 WL 3517504 *2 ("The basic function of any trigger is to release the hammer"). Additionally, Defendant ignores a decision in the Eastern District of New York, in a proceeding brought under 18 U.S.C. § 1345 against the manufacturer and distributor of the FRT-15 and WOT that came to the opposite conclusion. *United States v. Rare Breed Triggers, LLC, et. al.*, 690 F.Supp.3d 51 (EDNY 2023) (issuing a preliminary injunction and finding that the government was likely to succeed in proving that the FRT-15 and WOT are machineguns under 26 U.S.C. § 5845(b)).[3] Finally, while the devices at issue may be similar to those considered by the district courts in EDNY and NDTX, they are not the same devices, and no court has developed a full factual record considering these specific devices under the statute.

## V.     CONCLUSION

Defendant has not cited to any case law that should lead this Court to re-evaluate its prior holdings. The law of the case set forth in the Court's prior rulings should stand. The superseding indictment contains sufficient factual allegations supporting every element of the offense charged.

---

3. The *Rare Breed Triggers* case is also on appeal to the Second Circuit. Dkt. 23-7276 (filed October 5, 2023).

WHEREFORE, the United States respectfully requests that the Court deny Defendant's Motion to Dismiss the Superseding Indictment.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 15th of October 2024.

> W. Stephen Muldrow
> United States Attorney
>
> *s/Linet Suárez*
> Linet Suárez
> Assistant United States Attorney
> USDC-PR No. G03015
> United States Attorney's Office
> 350 Carlos Chardón Street
> San Juan, Puerto Rico 00918
> Linet.Suarez2@usdoj.gov
> Tel: (787) 282-1843

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the date above, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

> *s/Linet Suárez*
> Linet Suárez
> Assistant United States Attorney